**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Alberto ROSA, Appellee.**

**Commonwealth of Pennsylvania, Appellant,**

v.

**Jose Custodio, Appellee.**

Superior Court of Pennsylvania.

Argued April 14, 1999.
Filed June 22, 1999.
Reargument Denied Aug. 25, 1999.

Michael Erlich, Asst. Dist. Atty., Philadelphia, for Com., appellant.

Peter D. Quinn, Philadelphia, for Rosa, appellee.

John A. Ryan, Philadelphia, for Custodio, appellee.

Before CAVANAUGH, JOHNSON and TAMILIA, JJ.

TAMILIA, J.:

¶ 1  The Commonwealth appeals from the April 7, 1998 Order suppressing two guns, three knives and several crossbow arrows seized from a vehicle in which appellees, Jose Custodio and Alberto Rosa, were passengers. Although the Commonwealth properly filed separate appeals as to each appellee, we note that appellees were co-defendants in the instant prosecution, the suppression Order was entered as to both appellees and the appeals involve the same legal issue. As a result, we will resolve both appeals in this Opinion.

¶ 2  The testimony presented at the suppression hearing and deemed credible by the suppression court indicates that on October 28, 1997, at approximately 1:24 a.m., Philadelphia Police Officer William Alexander stopped a 1981 Buick automobile based on his observation of an expired license plate sticker. The Buick was driven by Daniel Ortiz, who is not a party to this action. Appellee Rosa was located in the front passenger seat and appellee Custodio was located in the back seat. As Officer Alexander pulled up behind the vehicle, he observed Custodio "looking back, and moving around, moving forward, and looking back—just moving around a lot." (N.T., 4/7/98, at 11.) Officer Alexander approached the vehicle and asked Ortiz for his driver's license, vehicle registration and proof of insurance. Ortiz was unable to produce these documents.

¶ 3  While questioning Ortiz, Alexander shined his flashlight into the car and observed, in plain view, a 13- or 14-inch butcher knife on the rear seat next to Custodio, a steak knife on the floor next to Custodio, and several 10-inch crossbow arrows or darts on the center console between Ortiz and Rosa. After backup arrived, Alexander directed all three men to step out of the car. When Ortiz opened the driver's door, Alexander noticed a third knife on the floor next to him. The three men were taken to the rear of the car, where they placed their hands on the trunk and were observed by two backup officers. Officer Alexander then returned to the passenger compartment of the vehicle in order to retrieve the knives and crossbow arrows. As he attempted to retrieve the knife located on the back seat, the seat, which was not bolted to the floor, "flipped up," revealing two handguns beneath the seat. (Slip Op., Sarmina, J., 9/25/98, at 3.) Appellees were subsequently charged with possessing instruments of crime, carrying firearms without a license and carrying firearms on a public street in Philadelphia.

¶ 4  At the close of the suppression hearing, the court stated that it found Officer Alexander's testimony to be credible (N.T. at 73). Nonetheless, the court granted appellees' motion to suppress on the basis that Alexander lacked probable

cause to enter the car for the purpose of retrieving the knives and arrows. Since the knives should not have been seized, the court held it necessarily followed that the subsequent, although apparently inadvertent, discovery of the handguns was also illegal. In ordering suppression, the court emphasized that Officer Alexander was not in danger at the time of the search because appellees were located at the rear of the car and backup had arrived. The court also stated that Officer Alexander was not justified in entering the vehicle to retrieve the knives he observed because knives "are not, per se, illegal, and they do not carry the same indicia of control as do firearms." (N.T. at 72–73.) Since the suppression Order substantially handicapped the prosecution of appellees, the Commonwealth appealed, arguing Officer Alexander was authorized to conduct a protective search of the vehicle's passenger compartment under the facts of this case.

¶ 5 In reviewing the ruling of a suppression court, "an appellate court must first ascertain whether the record supports the factual findings of the suppression court, and then determine the reasonableness of the inferences and legal conclusions drawn therefrom." *Commonwealth v. Nester*, 443 Pa.Super. 156, 661 A.2d 3, 4 (1995), *quoting Commonwealth v. Oglialoro*, 377 Pa.Super. 317, 547 A.2d 387, 387 (1988), *aff'd*, 525 Pa. 250, 579 A.2d 1288 (1990). We are bound by the suppression court's factual findings and may reverse only if the legal conclusions drawn therefrom are in error. *Commonwealth v. Robinson*, 438 Pa.Super. 119, 651 A.2d 1121 (1994).

¶ 6 As a preliminary matter, we note that, despite its express finding at the suppression hearing that Officer Alexander's testimony was credible, the suppression court states in a footnote to its Opinion that it "found it incredible that Officer Alexander entered this two-door vehicle in the manner in which he described in order to retrieve the items he had already seen."

(Slip Op., at 3 n. 5; citation omitted.) In addition to the fact that, unlike the suppression transcript, the court's Opinion is not part of the appellate record, *See In re D.D.*, 409 Pa.Super. 35, 597 A.2d 648 (1991) (en banc), the Opinion does not disclose which part of the officer's account of how he entered the vehicle the court deemed incredible. Moreover, neither appellee testified as to the manner in which Alexander entered the car and found the guns. Thus, although the suppression court was free to reject all, some or none of the testimony presented, it remains unclear what factual findings, if any, the court made regarding Alexander's entry into the back seat. At any rate, the court's Opinion states, "As a result of his entry into the back seat of the vehicle, the back seat flipped up, from which Officer Alexander then retrieved two handguns." (Slip Op. at 3.) Although this statement does not contradict Alexander's account, we will assume that it constitutes the court's factual finding as to how Alexander discovered the guns at issue. Bound by this finding, and others made by the court, we proceed to consider the legal principles relevant to this appeal.

¶ 7 It is well-settled that a police officer may stop a vehicle based on the reasonable belief that a provision of the Motor Vehicle Code has been or is being violated. *Commonwealth v. DeWitt*, 530 Pa. 299, 608 A.2d 1030 (1992). "Incident to this stop, an officer may check the vehicle's registration, the driver's license and obtain any information necessary to enforce provisions of the motor vehicle code." *Commonwealth v. Sedgwick*, 434 Pa.Super. 448, 644 A.2d 167, 167–168 (1994). Further, "when an officer detains a vehicle for violation of a traffic law, it is inherently reasonable that he or she be concerned with safety and, as a result, may order the occupants of the vehicle to alight from the car." *Commonwealth v. Brown*, 439 Pa.Super. 516, 654 A.2d 1096, 1102 (1995). Finally, courts have held that "an officer has the right to conduct a

weapons search of an automobile if there is a reasonable belief that the suspect is dangerous and that the suspect might gain immediate control of weapons." *Commonwealth v. Austin*, 428 Pa.Super. 466, 631 A.2d 625, 627 (1993).

¶ 8 Instantly, there is no question that the vehicle in which appellees were passengers was properly stopped for a violation of the Motor Vehicle Code, that Officer Alexander properly requested a driver's license and other relevant information and that he was authorized to remove the occupants from the vehicle. The only question is whether Alexander was authorized to enter the vehicle and seize the knives and arrows, which seizure led to the discovery of two handguns beneath the back seat. Our resolution of this question is guided by two important decisions, both of which compel the conclusion that the suppression Order entered below must be reversed.

¶ 9 The first case is *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), in which the United States Supreme Court extended to automobiles the protective search authorized with regard to persons in the landmark case of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Long*, two police officers were patrolling in a rural area at night when they noticed a vehicle being driven in an erratic and unsafe manner. The officers observed the car run into a ditch and proceeded to investigate. As they approached, the officers were met at the rear of the car by Long, the car's sole occupant. Long appeared "to be under the influence of something" and he was unable to produce a driver's license or registration. Apparently in order to obtain the registration, Long walked toward the open door of the car and the officers followed. The officers saw a hunting knife on the floorboard in front of the driver's seat. The officers conducted a pat-down search of Long, but no weapons were discovered. One of the officers then shined his flashlight into the car and saw something protruding from under the armrest on the front seat. The officer reached in the car, lifted the armrest and found an open pouch containing what was later determined to be marijuana. Long was arrested, his car was impounded and a subsequent search discovered a significant amount of marijuana in the trunk.

¶ 10 Although Long was convicted of drug possession, the Michigan Supreme Court reversed, holding that "the sole justification of the *Terry* search, protection of the police officers and others nearby, cannot justify the search in this case." *Long, supra* at 1036, 103 S.Ct. at 3473, 77 L.Ed.2d at 1211. The United States Supreme Court granted certiorari "to consider the important question of the authority of a police officer to protect himself by conducting a *Terry*-type search of the passenger compartment of a motor vehicle during the lawful investigatory stop of the occupant of the vehicle." *Id.* at 1036, 103 S.Ct. at 3474, 77 L.Ed.2d at 1212.

¶ 11 The Court began its analysis by emphasizing that protective searches are justified where a police officer has a reasonable belief that a suspect poses a danger, that roadside encounters between police and suspects are particularly hazardous and that danger may arise where weapons are placed in a location where they are accessible to the occupants of a vehicle. "These principles compel our conclusion," the Court held, "that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief ... that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049, 103 S.Ct. at 3480, 77 L.Ed.2d at 1220. Having set forth the applicable standard, the Court went on to consider whether the police possessed a reasonable belief that Long posed a danger and that he had immediate access to weapons. In reversing the Michigan high court, the Supreme Court held:

The circumstances in this case clearly justified Deputies Howell and Lewis in their reasonable belief that Long posed a danger if he were permitted to reenter his vehicle. The hour was late· and the area rural. Long was driving his automobile at excessive speed, and his car swerved into a ditch. The officers had to repeat their questions to Long, who appeared to be "under the influence" of some intoxicant. Long was not frisked until the officers observed that there was a large knife in the interior of the car into which Long was about to reenter. The subsequent search of the car was restricted to those areas to which Long would generally have immediate control, and ·that could contain a weapon.... In this case, the officers did not act unreasonably in taking preventative measures to ensure that there were no other weapons within Long's immediate grasp before permitting him to reenter his automobile.

*Id.* at 1051, 103 S.Ct. at 3481, 77 L.Ed.2d at 1220–1221.

¶ 12 There can be little question that the protective search at issue in this case was authorized under the *Long* analysis. As the above-quoted passage indicates, the Court found the officers possessed a reasonable belief that Long posed a danger because he was stopped at night in a rural area, he was driving erratically, he appeared intoxicated and did not respond to requests for a license and registration and his car contained a single large knife in plain view. Although some of the particular facts at issue in *Long* are not present herein, the cases are quite similar. Appellees in this case were stopped late at night for a violation of the Motor Vehicle Code, the driver was unable to produce a license, registration or insurance and Officer Alexander observed not one but three knives and several arrows near the occupants of the vehicle. In addition to the number of potential weapons involved in this case, other factors indicate that this case may well have involved more indicia of danger than the facts of *Long*. For instance, unlike *Long*, Officer Alexander was alone when he pulled over the vehicle, which in this case contained three men, each of whom had ready access to weapons, and appellee Custodio was extremely active in the back seat as Officer Alexander approached the vehicle.

¶ 13 Moreover, it is important to reiterate the suppression court's finding that the officers in this case should not reasonably have been in fear of appellees—and therefore no protective search was warranted—because appellees were under the control of backup officers at the rear of the vehicle at the time of the search and the knives and arrows "are not, per se, illegal[.]" Appellees also assert these factors as evidence that any fear possessed by Officer Alexander was unreasonable. Both factors were also present in *Long* and the relevance of each was expressly rejected by the Court therein. Initially, the Michigan Supreme Court had found that it was not reasonable for the officers to fear that Long could injure them because he was under their control and did not have access to the hunting knife below his front seat. Rejecting this finding, the United States Supreme Court held:

This reasoning is mistaken in several respects. During any investigative detention, the suspect is "in the control of the officers in the sense that he may be briefly detained against his will...." Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile. In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside[.]

*Id.* at 1051, 103 S.Ct. at 3482, 77 L.Ed.2d at 1221 (citations omitted). In this case, not only was the fear of a suspect breaking away from police control compounded by

the fact that three men were being detained, but it is clear the three men would have been permitted to reenter the car if the handguns were not discovered. Also, in rejecting the relevance of the fact that knives are not necessarily illegal, the Supreme Court stated, "Assuming, arguendo, that Long possessed the knife lawfully, we have expressly rejected the view that the validity of a *Terry* search depends on whether the weapon is possessed in accordance with state law." *Id.* at 1052 n. 16, 103 S.Ct. at 3482 n. 16, 77 L.Ed.2d at 1222 n. 16 (citation omitted); *see also Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (handgun properly seized from suspect's waistband regardless of whether carrying a gun in public was authorized by state law). Although the suppression court in the instant case makes no reference to *Long*, it is clear the Supreme Court's holding therein authorized Officer Alexander's protective search of the vehicle in which appellees were passengers.

¶ 14 This conclusion is further supported by the decision of our Supreme Court in *Commonwealth v. Morris*, 537 Pa. 417, 644 A.2d 721 (1994), which applied the *Long* analysis. In *Morris*, a police officer observed a car parked in an unusual, although not illegal, location at approximately 10:30 p.m.. After noticing the officer, Morris, the driver, drove away. He made a turn without signaling, however, and the officer conducted a traffic stop. As the officer approached the driver's door, Morris leaned to his right and toward the floor in the center of the car. Although the officer directed him to place his hands on the wheel, Morris reached quickly between his legs toward the floor of the car. The officer ordered Morris from the car. When the driver's door was opened the officer noticed a 24–inch metal pipe wedged between the driver's seat and the door. The officer then escorted Morris to the rear of the car and ordered him to place his hands on the trunk. A patdown search of Morris revealed no weapons. The officer then returned to the passenger compartment of the car and, using his flashlight, observed a black plastic bag on the front seat. The officer retrieved the bag, which was large enough to contain a weapon. Upon opening it, he discovered cocaine, marijuana and related drug paraphernalia. Morris was then arrested. His suppression motion was denied and he was convicted of drug possession and possession with intent to deliver. On appeal, this Court and our Supreme Court affirmed.

¶ 15 Applying *Long*, a majority of the Supreme Court relied on the following facts for the conclusion that the arresting officer reasonably feared for his safety:

> Appellant's leaning briefly to his right and towards the floor near the center of the car when he was stopped by the officer, as well as appellant's reaching quickly between his legs when he was ordered to place his hands on the steering wheel were acts consistent with an attempt either to conceal or reach for a weapon. In addition, the officer's discovery of a metal pipe wedged between the driver's seat and the door would tend to indicate that appellant might have access to other weapons in the passenger compartment.

> . . .

> Under *Long*, such a reasonable belief based on specific articulable actions taken by appellant (i.e., specific articulable facts) entitles an officer to conduct a search of those portions of the passenger compartment of a suspect's vehicle in which a weapon could be placed. Thus, the bag in question was properly searched since it was large enough to hold a weapon. Indeed, had Officer Benincasa allowed appellant to return to his vehicle without searching the bag in question, he would have been taking a grave risk that appellant would remove a weapon from the bag and use it. Our constitutional safeguards do not require an officer to gamble with his life.

*Id.* at 422, 644 A.2d at 723–724. Like *Long*, *Morris* is closely analogous to the instant case. Appellant Morris was stopped at night for a traffic violation. When the officer observed furtive movements inside the vehicle, he utilized a flashlight and observed an otherwise legal device that nonetheless could be used as a weapon. Appellant was then taken to the rear of the car while the passenger compartment was searched. Also like *Long*, the facts of *Morris* appear to involve less indicia of danger than the facts of the instant case, which involved multiple suspects and weapons.

¶ 16 In addition to the fact that the suppression court apparently did not consider *Long* or *Morris*, appellees make little attempt to distinguish the cases, despite the fact that they are the central cases relied on by the Commonwealth. Custodio, for instance, argues that *Long* is inapplicable because the Supreme Court therein upheld only a warrantless search "incident to *arrest.*" (Appellee Custodio's brief at 9 (emphasis in original).) This is clearly inaccurate. The suspect in *Long* was not arrested until after the passenger compartment was searched and marijuana was discovered. For this reason, the Court employed a *Terry* analysis, which applies to an investigatory stop conducted *prior.* to arrest. The Court's holding was that a protective search may be conducted when an officer reasonably fears for his safety, regardless of whether an arrest is made, or even warranted. In fact, the Court was particularly concerned that "if the suspect *is not placed under arrest,* he will be permitted to reenter his automobile, and he will then have access to any

weapons inside[.]" *Long* at 1051, 103 S.Ct. at 3482, 77 L.Ed.2d at 1221 (emphasis added). Custodio also argues *Morris* is inapplicable because the Court in that case authorized only a *"quick* search of the passenger compartment[.]" (Appellee Custodio's brief at 7 (emphasis in original).) However, it must be recalled that the officer in *Morris* opened a sealed bag that was lying on the front seat of the suspect's vehicle and used his flashlight to look under the front seat on both the driver and passenger sides. *Id.* at 419, 644 A.2d at 722 n. 1. This ·search was clearly more intrusive than the one at issue in the instant case. Custodio further presents the curious argument that, unlike the knives and arrows in this case, the pipe at issue in *Morris* "had no apparent social purpose." (Appellee Custodio's brief at 8.) Even assuming that the knives in this case were, as Custodio suggests, mere "kitchen utensils," it is difficult to imagine what "social purpose" they might have been serving while scattered throughout a vehicle occupied by three men at 1:24 a.m. Moreover, appellee does not explain what "social purpose" the crossbow arrows were serving. At any rate, it might be assumed, as the Commonwealth suggests, that the knives and arrows have no greater social utility than a pipe, which is used for a variety of household purposes.[1]

¶ 17 In a lengthy, but extremely sloppy brief, appellee Rosa's entire argument regarding *Long* is as follows:

In *Long*, two police officers searched a trunk and found marijuana after they had arrested the defendant who had other contraband, i.e., marijuana, in plain

---

1. Custodio also cites the recent decision of the United States Supreme Court in *Knowles v. Iowa*, —— U.S. ——, 119 S.Ct. 484, 142 L.Ed.2d 492, 67 U.S.L.W. 4027 (1998). In *Knowles*, which is clearly inapplicable to this case, the Court held that the full search of an automobile by an officer who conducts a traffic stop, but who lacks probable cause or the driver's consent, violates the Fourth Amendment. The Court expressly distinguished the limited protective searches authorized by

*Long*, stating, "Even without the search authority Iowa urges, officers have other, independent bases to search for weapons and protect themselves from danger. For example, . they may ... conduct a *'Terry* patdown' of the passenger compartment of a vehicle upon reasonable suspicion that an occupant is dangerous and may gain immediate control of a weapon, *Michigan v. Long* [463 U.S. 1032, 103 S.Ct. at 3471, 77 L.Ed.2d 1201 (1983).]" *Id.* at ——, 119 S.Ct. at 488.

view, "protruding", the case states, from under the armrest. What contraband did they find in this case? Officer Alexander found some kitchen knives, which may or not have been "in plain view" and they are not contraband[.]

(Appellee's brief at 17.) Initially, Rosa's recitation of the facts of *Long* is inaccurate and misleading. The entire thrust of the *Long* analysis, and its enduring legacy, is the authorization of a protective *Terry* search of a vehicle *before*, or regardless of whether, the occupants are arrested. Long was not arrested until marijuana was discovered in the bag on the front seat, and the fact that additional marijuana was discovered subsequently in an inventory search of the trunk was completely irrelevant to the Court's holding. In fact, the Court never addressed the validity of the trunk search and instead remanded to the Michigan court for that purpose. Moreover, the marijuana on the front seat was hardly "in plain view," since the officer had to lift the armrest to determine what was in the bag. Rosa's claim that the knives "may or may not have been 'in plain view'," is particularly tenuous since Officer Alexander's testimony in this regard was not challenged at the suppression hearing and the suppression court specifically found that the knives and arrows were in "plain view." ( Slip Op. at 4.) Finally, as noted, the fact that the knives and arrows in this case, like the knife and pipe at issue in *Long* and *Morris*, respectively, were not contraband is irrelevant. *Long, supra*, at 1052 n. 16, 103 S.Ct. at 3482 n. 16, 77 L.Ed.2d at 1222 n. 16 ("[W]e have expressly rejected the view that the validity of a *Terry* search depends on whether the weapon is possessed in accordance with state law.").

¶ 18 In an argument encompassing a single paragraph, Rosa also attempts to distinguish *Morris* on the basis that the officer in that case "acted alone and did not have everyone in the custody of other police officers." (Appellee Rosa's brief at 17.) Like his argument regarding the le-

gality of knives and arrows, this argument was expressly rejected by the *Long* Court, which held that custody of the suspect would not defeat the validity of a protective search because a suspect might break free from police or be allowed to return to his vehicle after the search is conducted. Finally, Rosa argues that, unlike the suspect in *Morris*, he made no furtive movements as the officer approached. However, Officer Alexander noted that Custodio was moving and looking around in the back seat, and the threat to the officer's safety was the same regardless of which suspect was acting suspiciously, particularly where each suspect had access to weapons. The attempts of Custodio and Rosa to distinguish *Long* and *Morris* are unavailing. In sum, it is clear that Officer Alexander was authorized to stop the appellee's vehicle based on a violation of the Motor Vehicle Code, *DeWitt*, supra, and that, after the driver failed to produce identification for himself or the vehicle, further investigation was warranted, *Sedgwick, supra*. Likewise, there is no question the officer was justified in removing the occupants from the vehicle, *Brown, supra*. When the Officer observed numerous knives and arrows in plain view inside the vehicle, he became reasonably concerned for his safety, particularly where he was outnumbered three-to-one. This conclusion is further supported by the fact that the stop was conducted late at night and Custodio made suspicious movements as Alexander's police car approached the vehicle.

¶ 19 Based on these facts, Officer Alexander reasonably concluded appellees were potentially dangerous and that they posed a threat to himself or others if they broke free of the backup officers or were allowed to return to the vehicle. He was, therefore, authorized to conduct a protective search of those areas of the passenger compartment that were accessible to the vehicle's occupants. *Austin, supra*. When he entered the vehicle to retrieve the knives he had observed, the back seat "flipped up," revealing two handguns. At that point, he was justified in seizing the guns and ar-

resting appellees. *See Long, supra* at 1050, 103 S.Ct. at 3481, 77 L.Ed.2d at 1220, ("If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband ... he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances.") (citations omitted). The holdings of *Long* and *Morris*, by which we are bound when construing the validity of a search under the Fourth Amendment, compel the conclusion that the suppression Order in this case must be reversed.

¶ 20 Finally, appellee Rosa argues that even if the search at issue was permissible under the Fourth Amendment, it nonetheless violated his rights under Article I, Section 8, of the Pennsylvania Constitution. Initially, we note that Rosa has raised this claim for the first time on appeal. Thus, we would be justified in deeming the claim waived. *See Commonwealth v. Kilgore*, 547 Pa. 346, 348, 690 A.2d 229, 230 (1997) (claim pursuant to Article I, Section 8, of the Pennsylvania Constitution deemed waive where raised for the first time on appeal); *Commonwealth v. Simmon*, 521 Pa. 218 n. 1, 555 A.2d 860 n. 1 (1989) (state constitutional claim raised for first time on appeal deemed waived). Moreover, in rejecting an identical claim, the *Morris* Court held:

> We have long held that the limited frisk for weapons permitted under *Terry v. Ohio* is likewise permissible under the Pennsylvania Constitution. Since *Michigan v. Long* is based on *Terry*'s rationale of protecting an officer's safety by permitting a limited search for weapons when the officer has a reasonable and articulable suspicion that a suspect may have access to a weapon, we hold that *Long*'s reasoning is also applicable to Article I, Section 8. Thus, appellant is not entitled to relief on state constitutional grounds.

*Id.* at 422 n. 3, 644 A.2d at 724 n. 3.

¶ 21 Having concluded that Officer Alexander's search of the vehicle occupied by appellees was permissible under the federal and state constitutions, we reverse the suppression Order of April 7, 1998.

¶ 22 Order reversed; case remanded for proceedings consistent with this Opinion.

¶ 23 Jurisdiction relinquished.

¶ 24 Concurring Statement by JOHNSON, J.

JOHNSON, J., concurring:

¶ 1 I join the opinion of my distinguished colleagues. I agree that in *Commonwealth v. Morris*, 537 Pa. 417, 644 A.2d 721 (1994), our Supreme Court adopted the standard announced by the United States Supreme Court under which the police may conduct a warrantless search of the passenger compartment of a vehicle for weapons. *See Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (holding that protective search of passenger compartment was reasonable under the principles articulated in *Terry* and other decisions of the United States Supreme Court). I also agree that the facts and circumstances of this case warranted a limited search of the vehicle for weapons. I write separately, however, to express my concern that the suppression court found credible Officer Alexander's testimony that as he attempted to retrieve the knife located on the back seat, the seat, which was not bolted to the floor, simply "flipped up." N.T. Suppression, 4/7/98, at 73. My own experience causes me to question seriously whether seats in modern cars can simply "flip up." Although the court later retracted that finding in its opinion, as the majority noted, we are bound by the court's credibility findings as stated on the record.